**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **MORFUDD RICHARDS**<br>**3 Ainger Road**<br>**London**<br>**NW3 3AR**<br>**England**<br>**United Kingdom**<br><br>**Petitioner,**<br><br>**v.**<br><br>**MAXINE HUGHES**<br>**1300 M Street N.W., Apt. 401**<br>**Washington, D.C. 20005**<br><br>**Respondent.** | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>* | **Civil No.** |

* * * * * * * * * * * * *

**VERIFIED PETITION FOR RETURN OF CHILD TO THE UNITED KINGDOM**
**<u>AND ISSUANCE OF SHOW CAUSE ORDER</u>**

**The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980; International Child Abduction Remedies Act, 22 U.S.C. 9001 *et seq*.**

## INTRODUCTION

1. Petitioner, Morfudd Richards ("Ms. Richards") by and through her undersigned attorneys, files this Verified Petition for Return of Child to the United Kingdom (hereinafter "Petition"), against the Respondent, Maxine Hughes ("Ms. Hughes"). The Petition is filed as a result of Ms. Hughes' wrongful retention of the parties' son, I.S.C.H.-R., born in 2013 in the United States from the United Kingdom.

2. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention") and the International Child Abduction Remedies Act[2] (hereinafter "ICARA").

3. The Convention came into effect in the United States of America on July 1, 1988, and was also ratified between the United States of America and the United Kingdom on July 1, 1988.[3]

4. The objects of the Convention are as follows: (1) to secure the immediate return of children wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Convention, art. 1.

## JURISDICTION

5. This Court has jurisdiction under ICARA § 9003 because this case involves the wrongful retention of a child under the age of sixteen in the United States from the child's habitual residence of the United Kingdom, and the child is currently located within the jurisdiction of this Court in the District of Columbia.

## FACTS

6. The parties met and began a relationship in London, England in March 2010.

---

[1]T.I.A.S. No. 11,670 at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10,493 (1986) text available at: https://www.hcch.net/en/instruments/conventions/specialised-sections/child-abduction (last accessed November 30, 2016).

[2] 22 U.S.C. 9001 *et seq*. (2016).

[3] *See* Hague Abduction Convention Country List, text available at: https://travel.state.gov /content/childabduction/en/country/hague-party-countries.html (last accessed November 30, 2016).

7. When they first met, Ms. Hughes was working as a journalist for the BBC in London, England. Ms. Richards was studying for a degree at the University of Brighton, which located in Sussex, England.

8. Ms. Hughes moved in with Ms. Richards to her apartment in London in approximately September 2010.

9. In 2011, the parties began having serious discussions about starting a family, and the various options available to same-sex partners for having a child.

10. The parties decided that Ms. Hughes would be the biological mother of the child, and that they would proceed with IVF using an unknown donor. The parties worked with a fertility clinic in London for the IVF process.

11. Ms. Hughes and Ms. Richards signed the consent forms at the fertility clinic required under English law to confirm that the parties were having the child together, and that Ms. Richards would be a legal parent of the child, along with Ms. Hughes.

12. Ms. Hughes became pregnant in May 2012.

13. After Ms. Hughes became pregnant, she was offered a job running the news bureau in Cardiff, Wales and rented an apartment there while continuing to share an apartment with Ms. Richards in London. During this time the parties moved into a new apartment together in Queen’s Park, London

14. Throughout the pregnancy, Ms. Richards – a restaurateur in London – had also been working on securing funding and a premises for a new restaurant she intended to open.

15. In September 2012, Ms. Richards secured the restaurant premises, and the restaurant opened in November 2012. All throughout the pregnancy, Ms. Hughes had been actively involved in and highly supportive of Ms. Richards’ opening of the new restaurant.

16. The parties' son, I.S.C.H.-R., was born in early 2013 in London, England.

17. Ms. Richards attended the birth.

18. Ms. Hughes and Ms. Richards are both named on the child's birth certificate.

19. For all of 2013 and 2014, the family continued to live and work in the United Kingdom. Ms. Hughes initially took maternity leave of approximately one year, which was offered by her employer (the BBC).

20. When Ms. Hughes returned to work at the conclusion of her maternity leave, she returned to her BBC job at the news bureau in Cardiff, Wales in the United Kingdom. Ms. Hughes rented a room in Cardiff and the child attended nursery there. Ms. Richards travelled to Cardiff approximately once a week. During this period the parties moved into another apartment in Primrose Hill, London close to Ms. Richards' restaurant.

21. Ms. Hughes worked in the BBC's news bureau in Cardiff for approximately one year. In approximately August of 2014, she was then offered, and accepted, a new position running the BBC's Midlands news bureau, based in Birmingham, England.

22. The parties continued to live in their apartment in London and the BBC provided a hotel room for Ms. Hughes three nights a week on the days she was required to be in Birmingham for work. The child attended nursery in Birmingham but continued to return to the family home in London every week. Ms. Richards travelled to Birmingham approximately once a week and stayed one or two nights at the hotel. The child lived with both parties together at the London apartment, and also spent time with Ms. Hughes at the hotel in Birmingham.

23. In early 2015, the parties learned that the BBC's Midlands new bureau would be merging with another news bureau in England, and that a more senior journalist to Ms. Hughes

would be running the newly merged new bureau. Ms. Hughes was therefore offered an alternative, but less senior, position with the BBC in London.

24. Ms. Hughes therefore began searching for new employment opportunities in her field.

25. In May 2015, Ms. Hughes informed Ms. Richards that she had been approached by TRT World, a new broadcasting arm of the Turkish State broadcasters, and had been offered a senior position in the new bureau based in Istanbul, Turkey.

26. Ms. Hughes explained that she intended to accept the position, and that it was a short term position that would last for a period of approximately 12-18 months. Ms. Hughes clearly articulated to Ms. Richards that at the end of the 12-18 month posting to Istanbul, she would be returning home to the United Kingdom to live.

27. By the time Ms. Hughes was offered the position in Istanbul in May 2015, the parties had already been experiencing strain and difficulties in their relationship. Ms. Hughes' stated plan to take a temporary position in Istanbul increased the tension in their relationship.

28. Ms. Hughes informed Ms. Richards that she intended to take the child with her to live in Istanbul for the 12-18 month temporary employment position.

29. Ms. Richards was hesitant to agree to such an arrangement for many reasons, most importantly, that her status as a same-sex parent of the child is not recognized in Turkey. It was not possible for Ms. Richards to live in Turkey.

30. Ms. Richards felt she was highly pressured by Ms. Hughes to make a decision as to whether she would agree for the child to live in Turkey with Ms. Hughes for the 12-18 month temporary employment period. The parties had many tense discussion and arguments about Ms. Hughes' desire to live with the child in a country where Ms. Richards' status as the child's parent

would not even be recognized. The parties enlisted the assistance of several friends, and also attempted mediation, in an effort to come to a resolution on how the family should proceed.

31. Ultimately, Ms. Richards decided that although she was hesitant about the temporary posting to Turkey that she would agree for the child to live in Turkey with Ms. Hughes for the period of her 12-18 month temporary employment there.

32. Ms. Hughes assured Ms. Richards that the assignment in Turkey with TRT would be no more than 12-18 months. Ms. Richards accepted Ms. Hughes' assurances that the assignment would last no more than 12-18 months, and thereafter, Ms. Hughes and the child would return to the United Kingdom to live. Ms. Richards therefore agreed that the child could travel with Ms. Hughes to Turkey and could live there with her for the period of her employment, which was to be no more than 12-18 months.

33. In August 2015, Ms. Hughes' employment with the BBC ended, and the family began to prepare Ms. Hughes and the child for the upcoming temporary move to Turkey. By this time, their romantic relationship had essentially ended, but they remained co-parents of the child. Ms. Richards was therefore actively involved in preparing Ms. Hughes and the child for the temporary move to Turkey.

34. In early August 2015, the family all travelled to Istanbul, Turkey together. They stayed together in a hotel in Istanbul for two weeks before moving Ms. Hughes and the child into a temporary apartment where they would live during Ms. Hughes' temporary employment with TRT in Istanbul.

35. During the time the family was all in Turkey together, Ms. Hughes presented Ms. Richards with a consent form for Ms. Richards to sign providing her consent for the child to live in Turkey with Ms. Hughes during the period of her employment (which she had told Ms.

Richards would be no more than 12-18 months). Ms. Richards believed the document was prepared by and required by Ms. Hughes' employer, and she therefore signed the document.

36. After helping Ms. Hughes move into the new apartment, Ms. Richards returned home to the United Kingdom.

37. From August 2015 until September 2016, Ms. Hughes worked for TRT in her temporary assignment in Turkey. During the period of her employment in Turkey, Ms. Hughes and the child visited the United Kingdom frequently, and Ms. Richards visited with the child in Turkey frequently. When she travelled to Turkey, however, Ms. Richards could not identify herself as the child's mother, because her status as the child's mother is not recognized in Turkey.

38. In August 2016, while still employed with TRT in Turkey, Ms. Hughes travelled with the child to the United States for three weeks. She told Ms. Richards that the trip was a vacation to visit New York and Massachusetts. Ms. Hughes and the child then travelled home to the United Kingdom for approximately one week before travelling back to their temporary home in Turkey.

39. In order to facilitate the child's travel between Turkey, the United Kingdom, and the United States, Ms. Richards signed a limited travel authorization, which authorized Ms. Hughes to travel with the child in and out of the specified countries until the end of December 2016.

40. In September 2016, Ms. Hughes informed Ms. Richards that she had been offered a job in Washington D.C. for four months running the North American bureau of the TRT World news organization. Ms. Hughes informed Ms. Richards that Ms. Hughes, the child, and Ms. Hughes' new partner would be relocating from Istanbul to Washington D.C. at the end of

September 2016, rather than returning home to the United Kingdom as Ms. Hughes and Ms. Richards had originally agreed.

41. Ms. Richards never agreed for the child to live outside the United Kingdom beyond the 12-18 months of Ms. Hughes' temporary employment position with TRT in Istanbul, Turkey. Ms. Richards never agreed for the child to live in the United States after the agreed upon temporary 12-18 month time period in Turkey.

42. At the end of September 2016, Ms. Hughes, the child, and Ms. Hughes' partner moved to Washington D.C.

43. At the time they moved to Washington D.C., Ms. Hughes and the child had been out of the United Kingdom for approximately 13 months for Ms. Hughes' temporary employment in Turkey.

44. In July 2015, before leaving the United Kingdom, Ms. Richards and Ms. Hughes had agreed for a temporary absence from the United Kingdom for the child for a temporary duration of 12-18 months, and agreed that the child would return to the United Kingdom at the end of that time period.

45. When Ms. Hughes moved to Washington D.C. with the child, Ms. Richards initially believed that there was nothing she could do to immediately seek the return of the child to the United Kingdom, because 18 months (the maximum period to which she agreed the child could live outside the United Kingdom) had not yet passed, even though Ms. Richards never agreed for the child to live in the United States at the conclusion of Ms. Hughes' employment in Turkey.

46. But in early October 2016, shortly after moving to the United States, Ms. Hughes informed Ms. Richards that she had made the unilateral decision not to return to the United Kingdom with the child to live.

47. Ms. Richards never agreed for the child to live permanently or indefinitely outside the United Kingdom. Ms. Hughes has made the unilateral decision to refuse to return the child to the United Kingdom at the end of her temporary employment in Turkey.

48. The parties only shared, settled intent with respect to the child's habitual residence has been that the child will reside in the United Kingdom.

49. The child has always resided in the United Kingdom. The parties have always had a shared and settled intent for the child to reside in the United Kingdom. They agreed to a temporary absence for the child to live in Turkey with Ms. Hughes for 12-18 months, and to thereafter return to the United Kingdom.

50. The child has always been fully involved and integrated in all aspects of daily and cultural life in the United Kingdom, even during the period of the temporary absence in Turkey.

51. The child's mother – Ms. Richards – lives in the United Kingdom. The child has extended family in the United Kingdom, both on Ms. Richards' side and Ms. Hughes' side of the family, including the child's grandparents, aunts and uncles, and other extended family.

52. The child attended nursery school in the United Kingdom, had a pediatrician in the United Kingdom, has a National Health Service number in the United Kingdom, attended informal and formal play groups and activities in the United Kingdom, and has friends in the United Kingdom.

53. Ms. Richards has rights of custody to the child by operation of law in the United Kingdom, as fully set forth below.

54. Ms. Hughes wrongfully retained the child in the United States beginning in early October 2016 when she unilaterally decided and announced to Ms. Richards that she would not be returning the child to his habitual residence of the United Kingdom as the parties' agreed.

55. Ms. Hughes is in breach of Ms. Richards' rights of custody as a result of her wrongful retention of the child in the United States from the child's habitual residence of the United Kingdom.

**COUNT I – WRONGFUL RETENTION**

56. Ms. Richards restates and re-alleges the allegations contained in Paragraphs 1 through 55 as if fully set forth herein.

57. The Convention applies to cases where a child under the age of sixteen (16) years has been removed or retained from his or her habitual residence in breach of rights of custody of a petitioner, which the petitioner had been exercising at the time of the wrongful removal or wrongful retention of the child.

58. The child in this case is under the age of 16.

59. The habitual residence of the child is the United Kingdom. The parties have only ever had a shared, settled intent for the child to reside in the United Kingdom. They have never had a shared intent for the child to live anywhere other than the United Kingdom. The parties agreed for the child to have a temporary absence in Turkey for a period of 12-18 months, at the end of which the child would return to the United Kingdom. They parties never agreed for the child to live outside the United Kingdom indefinitely, and never agreed for the child to live in the United States.

60. Ms. Richards has rights of custody over the child pursuant to English law. In accordance with the Human Fertilisation and Embryology Act 2008, the Children Act 1989, and

all amendments thereto, Ms. Richards is recognized under English law as a legal parent of the child, and is named on the child's birth certificate.

61. Ms. Richards therefore has joint parental responsibility for the child by operation of law.

62. Parental responsibility is defined in the Children Act 1989, Part 1, Section 3 as "all the rights, duties, powers, responsibilities and authority which by law a parent of a child has in relation to the child and his property".

63. Parental responsibility necessarily involves the "care of the child" and is therefore recognized as a right of custody under Article 5(a) of the Hague Convention.

64. Ms. Richards here, as a joint holder of parental responsibility over the child, did not ever agree for Ms. Hughes to retain the child in the United States permanently or indefinitely.

65. Ms. Hughes' retention of the child in the United States, and her unilateral decision and declaration that she will not be returning the child to his habitual residence of the United Kingdom, without the Ms. Richards' consent is in breach of Ms. Richards' rights of custody under English law.

66. Notice is therefore hereby given in this pleading that Ms. Richards is relying upon foreign law. FRCP 44.1.

67. At the time of Ms. Hughes' wrongful retention of the child, Ms. Richards was actually exercising her custody rights within the meaning of Articles 3 and 5(a) of the Convention, in that she is the mother of the child and has been fully involved in the child's day-to-day life since the child's birth.

68. Ms. Richards has promptly taken all legal steps available to her to seek the return of the child to the United Kingdom in accordance with the Hague Convention.

69. The present location of the child is within the District of Columbia at 1300 M Street, N.W., Apt. 401, Washington, D.C. 20005.

**COUNT II – ARTICLE 18 RETURN**

70. Petitioner invokes Article 18 of the Convention, which grants this Court plenary power to order the child's return at any time.[4]

**PROVISIONAL AND EMERGENCY REMEDIES[5]**

71. Ms. Richards requests that the Court issue a Show Cause Order forthwith ordering the appearance of Ms. Hughes and child before this Court on the first available date on the Court's calendar and directing the Petitioner to serve the Show Cause Order on Ms. Hughes by private process forthwith. The Court will then be able to confirm the whereabouts of the child as required by ICARA § 9003(b).

72. Pursuant to ICARA § 9004, in a proceeding for the return of a child, "[n]o court exercising jurisdiction … may … order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied." ICARA § 9004. In this case, the law referred to is that of the District of Columbia.

73. In the District of Columbia, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, *inter alia*, the resolution of both domestic and international child custody disputes and is codified as the D.C.

---

[4] *See* Convention, art. 18; *see also* 51 Fed. Reg. 10,494, 10,509 (1988) (legal analysis of the Hague Convention by the U.S. Department of State); *In re B. Del C. S. B.*, 559 F.3d 999, 1015-16 (9th Cir. 2009); *Alcala v. Hernandez*, 826 F. 3d 161 (4th Cir. 2016).

[5] This Court "[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition." ICARA § 9004.

Code Ann. § 16-4601.01 *et seq*. District of Columbia law addresses the appearance of the parties and the child in such cases in § 16-4601.10. That section authorizes this Court to order the appearance of the child and custodian or custodians. *Id.* This Court therefore has the authority to issue a show cause order, ordering the appearance of Ms. Hughes in that the provisions of 22 U.S.C. § 9004 can be met.

74. Ms. Richards further requests that this Court order, as a part of the Show Cause Order, a provision prohibiting either party from the removal of the child from the jurisdiction of this Court during the pendency of the proceedings in this Court, taking into possession all of the child's travel documents, and thereafter a Scheduling Order setting an expedited hearing on the Verified Petition for Return of Child to the United Kingdom.

**UCCJEA DECLARATION**

75. The details regarding the child that are required to be provided under the UCCJEA are as follows:

- From September 2016 - present, the child has been physically located with Ms. Hughes at 1300 M Street, N.W., Apt. 401, Washington D.C. 20005.
- From August 2015 – September 2016, the child was physically located in Istanbul, Turkey with Ms. Hughes.
- From birth in 2013 – August 2015, the child resided with both parties in the United Kingdom.
- Ms. Richards does not have information of any custody proceeding concerning the child pending in any other court of this or any other State.
- Ms. Richards does not know of any person or institution not a party to the proceedings that has physical custody of the child or claims to have rights of

parental responsibility or legal custody or physical custody of, or visitation or parenting time with the child.

## NOTICE OF HEARING

76. Pursuant to ICARA § 9003(c), Ms. Hughes will be given notice of any hearings in accordance with § 16-4602.05 of the UCCJEA.[6]

## ATTORNEYS' FEES AND COSTS INCLUDING TRANSPORTATION EXPENSES PURSUANT TO CONVENTION ARTICLE 26 AND ICARA § 9007

77. Ms. Richards has incurred expenses as a result of the wrongful retention of the child by Ms. Hughes. Ms. Richards will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of Ms. Hughes' wrongful retention.

78. Ms. Richards respectfully requests that this Court award all reasonable and necessary expenses and attorneys' fees and costs incurred to date as required by ICARA § 9007, reserving jurisdiction over further expenses.

## RELIEF REQUESTED

**WHEREFORE**, Petitioner, Morfudd Richards, respectfully requests the following relief:

A. That this Court issue an Order, after an expedited evidentiary hearing, directing the prompt return of the child to his habitual residence of the United Kingdom in accordance with Petitioner's rights of custody under the laws of the United Kingdom and Articles 5(a) and 18 of the Convention; and

B. That this Court issue a Show Cause Order forthwith, scheduling an initial show cause and scheduling hearing on the first available date on the Court's calendar, and requiring the

[6] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. ICARA § 9003(c).

Respondent to appear in person with the child at the show cause and scheduling hearing to confirm that the child is physically located within this Court's jurisdiction;

C. That this Court's Show Cause Order also include a provision ordering that neither party may remove the child from this Court's jurisdiction during the pendency of these proceedings, and taking into the Court's possession all of the child's passports and any other travel documents ;

D. That this Court's Show Cause Order be served on the Respondent by private process;

E. That this Court excuse the appearance of the Petitioner at the initial Show Cause Hearing as long as the Petitioner's counsel appears on his behalf and has full authority from the Petitioner to schedule an expedited evidentiary hearing and all related deadlines; and

F. That this Court issue an Order directing the Respondent to pay the Petitioner's reasonable and necessary expenses, including but not limited to attorneys' fees, suit money, expenses, and costs; and

G. That this Court grant any such further relief as justice and the Petitioner's cause may require.

**VERIFICATION**

I, Morfudd Richards, do solemnly declare and affirm under the penalties of perjury under the laws of the United States of America that the factual averments in the foregoing Verified Petition are true and correct to the best of my knowledge, information and belief.



November 30, 2016

Morfudd Richards
Petitioner

Date

/s/ Stephen J. Cullen
Stephen J. Cullen
Kelly A. Powers
Miles & Stockbridge P.C.
1500 K Street, N.W.
Suite 800
Washington, D.C. 20005
(202) 465-8374
(410) 385-3709 (e-fax)
scullen@milesstockbridge.com
kpowers@milesstockbridge.com

*Attorneys for Petitioner*